## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**CONCEICAO VEIGA (o/b/o I.J.M.)**

     **Plaintiff,**

**vs.**                                          **Case No. 8:07-CV-1001-T-EAJ**

**MICHAEL J.  ASTRUE**,
**Commissioner of Social Security,**

     **Defendant.**

_____/

## FINAL ORDER

Plaintiff, on behalf of her minor grandson, I.J.M. ("Claimant"), brings this action pursuant to the Social Security Act (the "Act"), as amended, Title 42, United States Code, Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for childhood Supplemental Security Income ("SSI").[1]

The undersigned, after reviewing the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the exhibits filed, the administrative record, and the pleadings and memoranda submitted by the parties in this case, as well as the relevant statutory and case law, reverses the ALJ's decision to deny Plaintiff's claim and remands the case for further proceedings.

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole and comports with

---

[1] The parties have consented in this case to the exercise of jurisdiction by a United States Magistrate Judge (Dkt. 16).

applicable legal standards.  See 42 U.S.C. § 405(g)(2003).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  If there is substantial evidence to support the Commissioner's findings, this court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner.  See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979).[2]

If the Commissioner committed an error of law, the case must be remanded for application of the correct legal standard.  See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then remand to the Commissioner for clarification is required.  See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

The Social Security Administration has established a three-step evaluation process to determine whether a child under the age of eighteen is disabled.  20 C.F.R.§ 416.924(a)-(d).  The first step is to determine whether the child is engaged in substantial gainful activity.  20 C.F.R.§ 416.9924(b).  If the child is not engaged in substantial gainful activity, the evaluator must determine whether the child has a medically determinable "severe" impairment or a combination of impairments that is "severe."  20 C.F.R. §§ 416.924 (a),( c).  A child under the age of eighteen  is considered disabled if he has a medically determinable physical or mental impairment (or combination of impairments) that causes marked and severe functional limitations and that can be expected to cause death, or that has lasted (or can be expected to last) for a continuous period of not

---

[2] Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

less than twelve months.  20 C.F.R. § 416.906.  Third, if it is determined that the child has a severe impairment, the examiner must determine whether the child's impairment or combination of impairments medically or functionally equals a listed impairment in 20 C.F.R. Pt. 404, Subpart P, Appendix 1.  20 C.F.R. §§ 416.924(a), 416.911(b)(1), 416.902.  In evaluating this step, the examiner must consider the combined effect of all medically determinable impairments, even those that are not severe.  20 C.F.R. §§ 416.923, 416.924(b)(4), and 416.926(a) and ( c).

To determine whether an impairment or combination of impairments functionally equals a listing, the examiner evaluates the child's functioning in six domains: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being.  (20 C.F.R. § 416.926a(b)(1)).  These six domains must be evaluated comparing the child to other children of the same age who do not have impairments. If the child has extreme limitations in one of the broad areas of development or functioning, or marked limitations in two of such areas of development or functioning, a finding of functional equivalence will be made.  20 C.F.R. §§ 416.926a(a),(d).

## I.

Plaintiff filed an application for childhood SSI benefits on behalf of Claimant on August 25, 2004,  which also serves as the onset date of the alleged disabilities. (T 9) Plaintiff alleges attention deficit hyperactivity disorder ("ADHD"), a learning disability, and asthma have rendered Claimant disabled.  (T 12, 23) Plaintiff's claim was denied  initially on February 24, 2005 and reconsidered on November 9, 2005.  (T 9, 319)  Upon Plaintiff's timely request, the ALJ held a hearing on Plaintiff's application on November 1, 2006.  (T 9) At the time of the hearing, Claimant was six (6)

years old and in first grade.  (T 323) Claimant lives with his grandmother, his legal guardian.  (Id.)

In a decision dated February 22, 2007, the ALJ found that Claimant's language delay, seasonal asthma, and ADHD constitute a combination of impairments that are severe.  (T 12)  However, the ALJ concluded that Claimant's impairments do not meet or medically equal an impairment listed in the Listing of Impairment 112.10 found in Appendix 1, Subpart P of Regulations No. 4.  (Id.)   The ALJ held that, while some of the Listing symptoms may have been present in initial evaluations, school notes and mental health records document Claimant's improvement with medications and therapy.  (Id.)  In addition, the ALJ found that no medical source mentioned findings equivalent in severity to the criteria of any Listed impairment, individually or in combination.  (Id.)

The ALJ also concluded that Claimant's impairments do not functionally equal the limitations specified in any Listings.  (Id.) The ALJ found that Claimant does have a marked limitation[3] in attending and completing tasks (due to Claimant's ADHD symptoms and language/speech delay) and has less than marked limitations in interacting and relating with others (due to ADHD symptoms), caring for himself (due to Plaintiff's reports that Claimant needs help dressing himself and brushing his teeth), and health and physical well-being (due to seasonal asthma attacks requiring medication).  (T 16-19)  Although Claimant's impairments could reasonably be expected to produce the alleged symptoms, the ALJ determined that the intensity, persistence, and

---

[3] Section 112.00(c) states: [w]here "marked" is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired as long as the degree of limitation is such as to interfere seriously with the ability to function (based on age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score is two standard deviations below the norm for the test will be considered a marked restriction.

4

limiting effects of Claimant's symptoms would not result in a disability.  (T 14)  Specifically, the

ALJ noted that substantial evidence shows that "all admit that medication and therapy are working."

(T 14) The ALJ concluded that, while Claimant may always need medication and assistance to

ensure he stays on task in the classroom, this fact does not result in functionally equaling a Listing.

(T 14)

On February 22, 2007, the Appeals Council declined to review the ALJ's decision, making

it the final decision of the Commissioner.  (T 3-5)  Plaintiff filed a timely petition for judicial review

and has exhausted all administrative remedies.  The Commissioner's decision is ripe for review

under the Act.

## II.

Plaintiff asserts that the ALJ erred by determining that Claimant's impairments do not meet

or equal the requirements of Listing 112.10 for Pervasive Developmental Disorder ("PDD").[4] (Dkt.

_____

[4] Listing 112.10 for Autistic Disorder and Other Pervasive Developmental Disorder imposes the following requirements:

> [c]haracterized by qualitative defects in the development of reciprocal social interaction, in the development of verbal and nonverbal communication skills, and in imaginative activity.  Often, there is a markedly restricted repertoire of activities and interests, which frequently are stereotyped and repetitive.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied:

    A.    Medically documented findings of the following:
          1.    For Autistic disorder all of the following:
                a.    Qualitative deficits in the development of reciprocal
                      social interaction;
                      AND
                b.    Qualitative deficits in verbal and nonverbal
                      communication and in imaginative activity.  OR

5

19 at 5)   Plaintiff contends that, based on a previous diagnosis of PDD, psychiatric and

---

    2.      For other pervasive developmental disorders, both of the following:

        a.      Qualitative deficits in the development of reciprocal social interaction;
               AND

        b.      Qualitative deficits in verbal and nonverbal communication and in imaginative activity.
               AND

B.      [f]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraphs B2 of 112.02.

Paragraphs B2 of 112.02 state:

    2.      For children (age 3 to attainment of age 18), resulting in at least two of the following:

    a.      Marked impairment in age-appropriate cognitive/communication function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

    b.      Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

    c.      Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

    d.      Marked difficulties in maintaining concentration, persistence, or pace.

psychological evaluations, school records and hearing testimony, the ALJ should have found that Claimant's impairments meet or equal Listing 112.10.[5] (Dkt. 19 at 3-5, 7-8)

The Commissioner responds that substantial evidence supports the ALJ's decision that Claimant's impairments do not meet or equal any Listing. (Dkt. 20 at 3) Specifically, the Commissioner argues that Claimant does not have qualitative deficits in the development of reciprocal social interaction or in verbal and nonverbal communications to meet or equal the criteria of Section A, Listing 112.10. (Dkt. 20 at 8-11) The Commissioner also asserts that Claimant does not have a marked impairment in age-appropriate cognitive/communication function, in age-appropriate social functioning, or in age-appropriate personal functioning to meet or equal the criteria of Section B, Listing 112.10. (Dkt. 20 at 11) Further, the Commissioner states that the opinions of state agency consultants support the ALJ's determination that Claimant's impairments do not meet or equal any Listings. (Dkt. 20 at 13-14)

### A. Medical and Psychological Evidence

From June 17, 2003 to September 8, 2004, Claimant was treated by Akbar Qureshi, M.D., ("Dr. Queshi"). (T 132-39) In June 2003, Dr. Qureshi examined Claimant for his three year old check-up and determined that Claimant was developmentally delayed. (T 139) Dr. Qureshi referred Claimant to a speech therapist and recommended that Claimant be evaluated for autism. (Id.)

On October 2, 2003, Claimant was evaluated by a Speech/Language Pathologist, Sharon Acosta, M.A., CC-SLP ("Acosta"). (T 126) Claimant was distractable and impulsive and needed

---

[5] Plaintiff's memorandum of law states in the heading under "Argument" that Claimant meets or equals Listing 101.02 and then states that Claimant meets the Listing at 112.10. (Dkt. 19 at 5) Because Listing 101.02 refers to a major dysfunction of a joint due to any cause and is found in abnormal functioning of a joint, the undersigned assumes the reference to Listing 101.02 to be erroneous.

7

redirection.  (T 127)   Claimant's cognitive and preacademic screening was evaluated when he was three years old; Claimant's social age was equivalent to 20 months and his self-help age was 26 months.  (T 128, 131)

On June 22, 2004, Juanita P. Harden, M.A., LMAC, ("Harden"), a counselor with the Behavior Health Division ("BHD") of the Winter Haven Hospital, completed an initial mental assessment of Claimant. (T 169-84)   During the evaluation, Claimant was hyperactive, excessively fidgety, did not respond well to redirection, and his speech was delayed.   (T 170)   Harden recommended a treatment plan to address Claimant's angry outbursts, poor concentration, and isolation. (T 164, 170)   Harden diagnosed Claimant with ADHD-Combined Type.  (T 172, 182)

On December 13, 2004, Gregory C. Landrum, Psy. D., DABPS, ("Dr. Landrum") completed a psychological evaluation on Claimant.  (T 140)  Dr. Landrum noted that Claimant was doing well and making good progress at school after Claimant was placed in an exceptional student program. Dr. Landrum also stated that Claimant had no trouble separating from his grandmother and entered the examination room in a cooperative and friendly manner.  Because Claimant's  pre-academic skills were quite limited, Dr. Landrum was unable to obtain any meaningful score on these skills. (T 141)   As to Claimant's cognitive functions, Dr. Landrum found that Claimant had "significant weaknesses in the area of common sense and social judgment, short-term auditory memory, fine motor skills, nonverbal concept formation and spatial visualization, and planning ability."  (T 142) Dr. Landrum added that his findings should be evaluated in light of Claimant's cultural and racial background and situational factors that may have affected Claimant's performance.  (Id.)   Dr. Landrum described an impression of ADHD-Combined Type, Disorder of Infancy, and seasonal asthma.  (T 142)   Finally, Dr. Landrum recommended that Claimant continue his current school

program and would benefit from an occupational therapy evaluation and speech/language assessment.  (Id.)

In February 2005, Bruce F. Hertz, Ph.D. ("Dr. Hertz") and Grena Wang, M.D. ("Dr. Wang") performed a consultative evaluation of Claimant and concluded that Claimant's impairments of ADHD, developmental delay, and asthma were severe impairments but did not meet or functionally equal any Listing.  (T 144)  Drs. Hertz and Wang found that Claimant had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating to others.  (T 146)  Drs. Hertz and Wang stated that, although there were reports of ADHD symptoms in Dr. Landrum's evaluation, there was no reports of any directly observed difficulty with regard to attention or hyperactivity.  Moreover, Drs. Hertz and Wang noted that Claimant's teacher reported no significant problems with interpersonal functioning and that Claimant did not have any significant problems interacting with Dr. Landrum.  (Id.)

From July 8, 2004 to March 2, 2005, Fredesvinda Jacobs-Alvarez, M.D. ("Dr. Jacobs-Alvarez"), a psychiatrist with the BHD of the Winter Haven Hospital, diagnosed Claimant with ADHD and prescribed Adderall and Clonidine to treat Claimant's symptoms.  (T 155-63, 166-67)  While under Dr. Jacobs-Alvarez's care, Claimant exhibited hyperactive and disruptive behavior, an intrusive appearance, and an inability to sit still.   (T 162-63)  Although Plaintiff reported that Claimant was doing better at school with the help of the medications, Plaintiff advised Dr. Jacobs-Alvarez in October 2004 and January 2005 that Claimant's medications wore off in the afternoon.  (T 160, 162)  As a result, Dr. Jacobs-Alvarez increased Claimant's dosage for Adderall.   (Id.)  From 2004 to 2006, Claimant received individual monthly therapy to address his problems.  (T 157-58, 206, 208, 210)

Starting in May 2005, Claimant was treated by George C. Winny, M.D. ("Dr. Winny"), a psychiatrist at the BHD of the Winter Haven Hospital.  (T 153, 153A, 154)  Dr. Winny stated that Claimant's appearance was "hyper," his speech and language was restricted, his mood was labile, and his cognitive functions were limited.   (T 153, 153A)  Dr. Winny diagnosed Claimant with ADHD-Combined Type and PDD.  (Id.)  In addition to Adderall and Clonidine, Dr. Winny prescribed Risperdel, an antipsychotic drug, to treat Claimant's PDD.  (T 153, 153A, 154)  From June  2005 to October 2005, Dr. Winny saw little change in Claimant's condition. (T 201-04)  Dr. Winny observed that Claimant was hyperactive, moody, crying, and always on the move; he diagnosed Claimant with ADHD-Combined Type and PDD.   (Id.)

On October 5, 2005, Claimant, while in kindergarten, was evaluated by Paul A. Foks, M.S., N.C.S.P. ("Foks") from Polk County Public Schools Psychological Services.  (T 250-57)  During Fok's interview, Claimant advised Foks he did not like all the noise in the classroom and the loud noise bothered him.  (T 254)  Further, Claimant told Foks that he had two imaginary friends: "Angel," a good friend, and "Solwol," who "looks like a baby, but acts like a monster."  (Id.) Claimant said that "Solwol's 'brain is too heavy' and when Solwol fell down, his brain 'came to his arm.'"  (Id.)  Claimant admitted that he talks to his imaginary friends all the time.  (T 254-255)

Claimant's teacher told Foks that Claimant hears voices that makes him say "bad" words. (T 252)  According to his teacher, Claimant said that his "brain tells him things" and he does not like being "looked at" by his classmates.  (Id.)  Claimant's teacher reported that Claimant does not verbally interact with his classmates and is considered a "loner."  (Id.)  His teacher stated that Claimant frequently makes the claim that people are calling him names.  Moreover, Claimant's teacher informed Foks that Claimant talks obsessively about unrelated topics, at which time she tries

10

to redirect his behavior.  (Id.)

Foks observed Claimant in his classroom and stated that Claimant appeared to do well at independent work.  (T 253)  Although he seemed to need the reassurance of his teacher, Claimant frequently brought his work to her attention and sought feedback and reinforcement; his teacher was able to redirect Claimant's behavior without difficulty.  (Id.)

Foks also observed that Claimant felt mild anxiety when going to the evaluation room.  (Id.) However, once Claimant was seated and tasks were assigned to him, he responded positively and gave his best efforts to complete these tasks.  (Id.)  Claimant's language skills generally appeared reasonably well developed. (Id.) Although Claimant was able to express himself in multi-word phrases and responded to questions with comprehension during a conversation, the examiner determined that Claimant's language comprehension during problem solving tasks appeared to be sub-average.  (Id.) The examiner also noted that Claimant enjoyed working for stickers provided for reinforcement.  (Id.)

Testing showed that Claimant was functioning intellectually within the average range of learning ability, but he was relatively weak in the verbal area, compared to the non-verbal area, and especially weak in verbal comprehension. (Id.) Claimant was slightly above average in tasks involving perceptual organizational skills, his knowledge of words, and on tasks involving visual abstract concepts.  (Id.) Claimant's academic skills were tested and were found to be at a kindergarten level, with most academic and pre-academic skills above average for a male his age. (T 253-54)  Claimant's visual motor skills fell with a standard score that was average for a male his age.  (T 254)

In summary, Foks found that, although Claimant had severe adjustment difficulties as a pre-

11

schooler, currently "adjustment in his classroom is much, much better, and he appears to be making academic progress as well." ( T 254) Foks mentioned that Claimant had been treated at the BHD of Winter Haven Hospital and diagnosed with ADHD and PDD.   Claimant's social and medical history included "a medication regimen addressing psychiatric diagnoses, odd/withdrawn behaviors with conduct component at home, a limited attention span with distractibility and impulsivity evident and a need for on-going supervision both at home and at school."  (Id.)

On November 2, 2005, Minerva C. Hernandez, M.D., ("Dr. Hernandez"), a state agency consultant, performed an evaluation of Claimant.  (T 188-94)  Dr. Hernandez found that Claimant had severe impairments of ADHD, autism, a learning disability, asthma, and PDD but these impairments did not meet or equal a Listing. (T 188)  Dr. Hernandez concluded that Claimant had no limitations in acquiring and using information; he had a marked limitation in attending and completing tasks; and he had less than a marked limitation in interacting and relating to others. (T 190)

On November 17, 2005, Dr. Winny examined Claimant and determined that Claimant was psychotic and hearing voices.  (T 200)  Dr. Winny concluded that Claimant's appearance was hyper and his mood labile; Dr. Winny diagnosed Claimant with ADHD and PDD.  (Id.)  From December 2005 to April 2006, Dr. Winny's records reveal that Claimant was hallucinating and hearing voices. (T 197-99)  From November 2005 to August 2006, Dr. Winny prescribed Abilify and Haloperidol, antipsychotic drugs, to treat Claimant's symptoms of PDD.  (T 195-206)

On August 21, 2006, Dr. Winny's assessment of Claimant's condition remained unchanged.[6]

---

[6] Although some of the mental status examination notes of June 2006 and August 2006 are illegible (T 195-96), Dr. Winny's assessment of Claimant on August 21, 2006 remained "unchanged." (T 195)

(T 195)  Dr. Winny increased Claimant's dosage for Adderall and recommended that Claimant continue with psychiatric assessments and monthly individual therapy.  (T 195, 206)  Claimant was still having angry outbursts two or more times a day and there was no improvement in his poor concentration.  (T 206)

   B.      **Evidence from Teachers**

In October of 2004, Claimant's teacher concluded that Claimant had no problems in any of the six domains and noted that Claimant had made wonderful improvement in the classroom.  (T 82-89)  On November 29, 2004, Claimant's teacher documented Claimant's language disorder, specifically his delay in expressive language, low vocabulary and difficulty in answering questions. (T 91-92)

In October of 2005, Claimant's teacher Deborah Kernan ("Kernan") determined that Claimant had problems in attending and completing tasks.  (T 107) According to Kernan's evaluation, on an hourly basis, Claimant had very serious problems focusing on finishing a task, completing work accurately, working without distracting self or others, and working at a reasonable pace.  (Id.)  Similarly, on an hourly basis, Claimant had serious or obvious problems with the following activities: paying attention, sustaining attention, refocusing on a task, carrying out instructions, waiting to take turns, changing from one activity to another, organizing school materials, and completing class and homework.  Kernan wrote that Claimant required constant prompts to stay on task; at times, Claimant became very obsessed with a particular thought and it was almost impossible to redirect his behavior.  (Id.)

In addition, Kernan observed that Claimant had problems interacting and relating to others. (T 108)  On a daily basis, Claimant had serious problems playing cooperatively with others, making

and keeping friends, and interpreting facial expression, body language, hints, and sarcasm. (Id.) Kernan explained that Claimant feels as if other students are being mean to him when no interaction has taken place. (Id.) Moreover, Kernan noted that Claimant "hears/ thinks bad words or that he is a 'bad boy.'" (Id.) Kernan wrote that on some days Claimant hears voices. (T 111) In reference to Claimant's medications, Kernan was not certain how his medications, or lack of medications, affected him. (Id.)

In March 2006, Claimant's teacher reported that Claimant appeared to be talking to others not present. (T 236) His teacher reported that this occurred once only when "he had run out of the medication Adderall." (Id.) Although Claimant's social and emotional behavior had improved and he was adjusting well, Claimant had significant problems with attention, concentration, following directions, and changes in routine which affect his overall ability to participate in classroom activities and affect his progress. (T 240) For example, during the period of February 2005 to April 2005, his teacher reported that Claimant screams for ten minutes almost on a daily basis between transitions in the classroom. (Id.) His teacher considered Claimant a loner. (Id.) Claimant's priority educational need was to develop and maintain positive peer relationships and to participate in group activities. (Id.)

In May of 2006, Claimant's teacher rated Claimant on five (5) different domains of functioning (on a scale of 1 to 5 with 1 being the highest) including: 1) curriculum and learning environment; 2) social and emotional behavior; 3) independent functioning; 4) health care; and 5) communication. (T 212) Claimant achieved a score of 1 on independent functioning and communication and a score of 2 on the other three areas. (Id.) The evaluation recognized a need for Claimant to receive special assistance but noted that Claimant was tested in October 2005 and

results showed that Claimant was functioning intellectually within the average range of learning ability.  (T 214-15)  A teacher observation during the 2005-2006 school year stated that Claimant no longer has problems transitioning from one task to another (previously he was very disruptive during transitional periods).  (T 215)  Claimant's teacher also noted that Claimant is able to accomplish most standard kindergarten assignments.  (Id.)

In the May 2006 evaluation, Claimant's teacher stated that "[Claimant] has done wonderful regarding his speech goals.  He can sequence up to a five-part story and retell it correctly.  He can answer questions regarding information that was taught to him.  His classroom teacher reports excellent performance in the classroom with academics."  (T 223)  Nevertheless, Claimant's teacher also stated that Claimant has difficulties in communication and learning because of language and speech problems evidenced in Claimant's difficulty in understanding and following directions, difficulty listening and interpreting verbal information, difficulty retaining and recall new information, difficulty understanding new concepts and  vocabulary, and difficulty understanding figurative language.  (T 218, 223)

Similar to the March 2006 evaluation, the May 2006 evaluation indicated that Claimant is a "loner" and does not verbally interact with classmates.  (T 220)  Although Claimant's teacher concluded that Claimant's behavior in the classroom had improved and he was making progress in all phases of instruction, Claimant continued to have significant problems with attention, concentration, and following directions.  (Id.)   In May 2006, Claimant's priority educational need was his need to develop and maintain positive peer relationships and to participate in group activities.  (Id.)

**C.      Evidence from the Hearing**

15

Plaintiff testified at the hearing regarding her concerns about Claimant hearing voices.  (T 338, 340)   Before Claimant started taking Abilify, an antipsychotic drug, Plaintiff reported that Claimant's voices told him to cut himself with a knife.  (T 341)  With medications, Plaintiff stated that the voices are not "telling him to cut himself any more" and the voices are "whispering now." (T 338, 341)   However, Plaintiff added that while the medications minimize the voices when Claimant is at school, the medications "don't take the whole thing away."  (T 338)  According to Plaintiff, when Claimant is very mad, the voices whisper to him; when he is very angry, the voices tell him to kill himself.  (T 341)

Regarding social interaction, Plaintiff testified that Claimant does not have any friends in school now.  (T 340)  Plaintiff stated that Claimant does not play or get along with other children. (T 340-41, 344-45)

At the hearing, when asked if he has friends at school, Claimant responded that he has a friend who lives in his neighborhood and rides on his school bus.  (T 326)  Claimant stated that his friends in the neighborhood are "Angel" and Papa Jerry, an adult neighbor.   (T 328)

Claimant testified that he can still hear creatures talking in his head.  (T 334)  When Claimant gets mad, Claimant testified that "my creature tell me to kill myself but I say, you are crazy."  (Id.) Claimant explained that "they just whisper at me, so I still can hear them, but they can't yell out or the other might could wake up my brain, and they don't the brain to hear it."  (Id.)  Claimant testified that he tells the creatures to "shut up and do not even bother me on this test or you might can make me maybe tell, and the word how to spell it and that'll be cheating and then I might get a zero and I don't want a zero."  (Id.)

### D.   Discussion

16

There is a three-tiered approach to determining whether a child has an impairment that meets, medically equals, or functionally equals a Listing. 20 C.F.R. §§ 416.924(a),416.911(b)(1), 416.902. First, the ALJ must consider whether the claimant meets a Listing. Johnson v. Barnhart, 148 Fed. Appx. 838, 840 (11th Cir. 2005). To meet a Listing, a claimant must show he has a diagnosed condition that is included in the Listings and provide medical evidence documenting that his condition meets the criteria for the listing and the duration requirement. Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002). Second, the ALJ must consider whether the claimant's impairment medically equals a Listing. 20 C.F.R. §§ 416.924(a). If a claimant contends he has an impairment that medically equals a Listing, the claimant must present medical evidence which describes how the impairment has such an equivalency. Bell v. Bowen, 796 F.2d 1350, 1353 (11th Cir. 1986). Finally, if the ALJ determines that a claimant does not meet or medically equal a Listing, the ALJ must ascertain whether claimant's impairment functionally equals a Listing by considering the six domains of functional limitations set forth in the regulations. Henry v. Barnhart, 156 Fed. Appx. 171, 173-74 (11th Cir. 2005). The claimant has the burden of demonstrating that his severe impairment functionally equals the limitations specified in the Listings. Shinn v. Commissioner, 391 F.3d 1276, 1282 (11th Cir. 2004). An ALJ is authorized to consider non-medical evidence to determine if a child's impairment is functionally equivalent to the limitations specified in the Listings. Shinn, 391 F.3d at 1284.

To meet the criteria for Listing 112.10, PDD, Claimant must satisfy the requirements of Listing 112.10. 20 C.F.R. Pt. 404, Subpt. P App., Listing 112.10. Pursuant to subsection A of the Listing for PDD, Claimant must show medically documented findings of qualitative deficits in the development of reciprocal social interaction and in the development of verbal and non-verbal

communication and imaginative activity.  (<u>Id.</u>)  Under subsection B of the Listing, Claimant must show a marked impairment in at least two appropriate age group criteria, including cognitive/communicative function, social functioning, personal functioning, or difficulties in maintaining, concentration, persistence, or pace.  (<u>Id.</u>)

The ALJ held that Claimant's impairments do not meet or medically equal the Listing for PDD because school and mental health records demonstrated his symptoms improved with medications and therapy.  (T 12)  In addition, the ALJ found that no medical sources mentioned findings equivalent in severity to the criteria of any Listed impairments, individually or in combination.  (<u>Id.</u>)  The ALJ did not indicate whether Claimant failed to satisfy the A criteria or B criteria of Listing 112.10.  The lack of  detailed discussion of the record evidence makes it difficult to ascertain whether the ALJ fully considered and properly assessed the medical evidence and school records.  Although the ALJ references medical records and school notes, it is impossible to determine the weight the ALJ accorded to the opinions of Claimant's treating physicians, consulting physicians, school psychologists, and teachers.  An ALJ is required to state specifically the weight accorded to each item of evidence and why he reached that decision.  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981).  In the absence of such an analysis, a court cannot determine if the ALJ's decision is supported by substantial evidence.  <u>Id.</u>  Consequently, the case is remanded for further proceedings and specific findings.

Furthermore, the Commissioner cannot rely on the ALJ's detailed discussion of functional equivalence  to support the ALJ's findings that Claimant did not meet or medical equal any Listing. The only detailed explanation of the ALJ's findings regarding Claimant's impairments is set out in the ALJ's discussion of the six domains of functional limitations which must be considered in

determining functional equivalence.  However, the ALJ is required to evaluate and make separate determinations on whether Claimant's impairments meet, medically equal, or functionally equal the Listing.  Ellington v. Astrue, No. 2:07-CV-789-CSC, 2008 WL 1805435, at *8 (M.D. Ala. Apr. 18, 2008) citing Shinn, 391 F.3d at 1279 (inquiries of whether claimant "meets," "medically equals," or "functionally equals" a Listing are separate and distinct).  Because the ALJ failed to evaluate each tier individually to determine whether Claimant "meets," "medically equals," or "functionally equals" a Listing, the court cannot determine if the ALJ's decision is support by substantial evidence.

Finally, the ALJ failed to address conflicting medical evidence, school records, and hearing testimony in determining that Claimant's impairments do not meet, medically equal, or functionally equal the Listing.[7]  For example, the ALJ found that Claimant's symptoms improved with medications and therapy and "all admit that medication and therapy are working."  (T 12, 14) However, the records of Drs. Jacobs-Alvarez and Winny, psychiatrists at the Winter Haven Hospital, indicate that Claimant's condition remained the same or deteriorated.  Although Claimant's treating physicians increased and changed Claimant's medications and recommended monthly individual therapy, Claimant continued to exhibit hyperactive and moody behavior.  In November 2005, Dr. Winner determined that Claimant was psychotic and hearing voices.  In August 2006, Dr. Winny reported that Claimant's condition remained unchanged and he was still having angry outbursts and there was no improvement in his poor concentration.

Similarly, the ALJ found that while Claimant's school records initially showed that Claimant

---

[7]  The Commissioner contends that Plaintiff does not challenge the ALJ's findings that Claimant's impairments do not functionally equal any Listing.  (Dkt. 20 at 5)  However, Plaintiff disputes the ALJ's findings on functional equivalency and argues that Claimant meets or equals the Listing at 112.10.  (Dkt. 19 at 5-7)

had problems interacting and relating to others, these problems became less frequent and less pervasive. Nonetheless, in an October 2005 psychological evaluation, Claimant is described as a "loner," who does not verbally interact with his classmates. Claimant admitted that he talks to his imaginary friends, "Angel" and "Solwol," all the time. In October 2005, Claimant's teacher stated that Claimant had a serious problem playing cooperatively with others as well as making and keeping friends. In March and May of 2006, a teacher evaluation reiterated that Claimant is a "loner," who does not interact with his classmates. In March and May 2006, Claimant's education priority was to develop and maintain positive peer relationships and participate in group activities. (Id.)

Further, the ALJ did not fully address the hearing testimony. Citing Plaintiff's testimony, the ALJ stated that, after Claimant started taking his medications, the creatures stopped telling him to kill himself. (T 13)  However, both Plaintiff and Claimant testified that, when Claimant is angry and mad, the creature in Claimant's head tells him to kill himself. (T 334, 341)  Plaintiff also stated that, while the medications worked during school hours, the medications did not control Claimant after 3:00 p.m. (T 337)  Contrary to the ALJ's finding as to Claimant's ability to interact and relate to other, Plaintiff testified that Claimant had no friends in school and Claimant testified about his imaginary friend.

In determining whether Claimant's impairments meet or equal a Listing, it is the ALJ's duty to weigh the evidence and testimony and to resolve conflicts in the evidence and testimony. Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996). If the ALJ considered the testimony of Plaintiff and Claimant unconvincing or conflicting, the ALJ should have made a credibility determination regarding their testimony. It is incumbent on the ALJ to make credibility findings as to claimant's

testimony and any lay witnesses who testify for him.  <u>See generally</u> <u>Ryan v. Heckler</u>, 762 F.2d 939, 942 (11th Cir. 1985).  A clearly articulated credibility finding with substantial supporting evidence in the record will enable a reviewing court to conclude that the ALJ properly considered Claimant's impairments as a whole.  <u>Foote v. Chater</u>, 67 F.3d 1553, 1562 (11th Cir. 1995).  A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  <u>Id.</u>

In sum, the court concludes that the ALJ failed to properly consider whether Claimant's impairments meet, medically equal, or functionally equal any Listing for the reasons stated previously.  Therefore, it cannot be determined whether the ALJ's findings are supported by substantial record evidence.

## III.

As discussed above, the Commissioner's decision must be remanded for the application of the correct legal standard and additional fact-finding.  This court expresses no view as to what the outcome of the proceedings should be on remand.  At the reopened hearing, each party shall have the opportunity to submit additional evidence.

### <u>Conclusion</u>

Accordingly and upon consideration, it is **ORDERED** and **ADJUDGED** that:

(1)     The decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings and consideration consistent with the foregoing; and

(2)     The Clerk of Court is directed to enter final judgment pursuant to 42 U.S.C. § 405(g) as this is a "sentence four remand."  <u>Shalala v. Schaefer</u>, 509 U.S. 292, 302-03 (1993); <u>Newsome v. Shalala</u>, 8 F.3d 775, 779-80 (11th Cir. 1993).  The final judgment shall state that if

Plaintiff ultimately prevails in this case upon remand to the Social Security Administration, any motion for attorneys' fees under 42 U.S.C. § 406(b) must be filed within fourteen (14) days of the Commissioner's final decision to award benefits.  See  Bergen v. Commissioner of Social Security, 454 F.3d 1273, 1278, n.2 (11th Cir. 2006).

**DONE AND ORDERED** in Tampa, Florida on this 19th day of September, 2008.


ELIZABETH A JENKINS
United States Magistrate Judge